UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————————

IN RE LEHMAN BROTHERS HOLDINGS INC.,

                Debtor.

—————————————————————————————

MAXIMILIAN CORETH,

                Appellant,

      - against -

BARCLAYS CAPITAL INC.

                Appellee.

—————————————————————————————

OLIVIA BAM,

                Appellant,

      - against -

BARCLAYS CAPITAL INC.

                Appellee.

—————————————————————————————

11 Civ. 2792 (JGK)

OPINION AND ORDER

11 Civ. 2985 (JGK)

JOHN G. KOELTL, District Judge:

    The appellants, Maximilian Coreth and Olivia Bam, appeal from Orders of the United States Bankruptcy Court for the Southern District of New York (Peck, J.), dated March 8, 2011, dismissing the appellants' complaints in two adversary proceedings.  The Orders were based on a Memorandum Decision dated February 22, 2011.  The appellants are two former employees of Lehman Brothers Inc. ("LBI") who seek to recover certain guaranteed minimum bonus payments they claim they are

owed following their termination without cause from Barclays Capital Inc. ("Barclays"), where they were employed as "Transferred Employees" after Barclays bought LBI's business by way of an Asset Purchase Agreement ("APA") following Lehman's bankruptcy in September, 2008.

The Bankruptcy Court dismissed both appellants' adversary complaints, concluding that the appellants did not have standing to sue Barclays because they were third-party beneficiaries under the APA and that, in any event, Barclays did not assume the obligation to pay the guaranteed minimum bonuses owed under the appellants' LBI employment contracts.  The appellants now challenge those conclusions.  For the reasons explained below, the Orders of the Bankruptcy Court are affirmed.

## I.

### A.

In April, 2008, Maximilian Coreth entered into a contract with LBI for his employment as a Managing Director in LBI's Fixed Income Division.  (Coreth R. 1 Ex. A.)  Coreth's employment contract with LBI provided that, for each of performance years 2008 and 2009, Coreth would receive an annualized base salary of $200,000 and a "bonus in the amount of $9,800,000."  Id. at 1.  The agreement also provided that, "[f]or the avoidance of doubt, in the event your employment is

terminated by [LBI] without Cause before the payment in full of the guaranteed minimum bonus for performance years 2008 and 2009, you will be paid on the applicable bonus payment dates any unpaid guaranteed minimum bonus for such years, payable part in cash and part in conditional equity awards . . . ." Id. at 2.

In March, 2008, Olivia Bam entered into a contract with LBI for her employment as a Salesperson with the corporate title of Vice President in LBI's Fixed Income Division. (Appendix to Plaintiff-Appellant's Brief ("Bam R.") at A-14.) Bam's employment contract with LBI provided that, for performance year 2008, Bam would receive a bi-weekly base salary of $4,423.08 and a "minimum bonus in the amount of $185,000." Id. The agreement provided that "[t]he bonus amount set forth above will be paid at the time and in the amount stated except that it will not be payable . . . if, before the date of scheduled payment, you have resigned or have been terminated from [LBI] because of misconduct, breach of [LBI] policies or rules" or other circumstances constituting "Cause." Id.

Lehman had a severance plan, pursuant to which Lehman "may offer severance pay, notice pay, accrued unused vacation pay and/or other separation payments if employment with the Firm is terminated involuntarily due to a 'reduction in force.'" (Bam R. at A-118.) Under the severance plan, an employee was ineligible to receive severance if, among other circumstances,

that individual "will receive further payments pursuant to a
compensation agreement (compensation 'guarantee') in an amount
equal to or in excess of the total amount of severance . . . for
which the employee might otherwise be eligible under the Plan."
Id.  Severance pay was to be "based on 'years of service,' 'base
salary,' and corporate title" and the Plan Administrator was to
have "sole and absolute discretion" to decide "whether an
employee involved in a reduction in force will be offered an
additional special separation payment" and to determine the
amount of any such payment.  (Bam R. at A-119.)

### B.

On September 15, 2008, Lehman Brothers Holdings Inc. filed
a voluntary petition for bankruptcy relief pursuant to Chapter
11 of the Bankruptcy Code.  In re Lehman Bros. Holdings Inc.,
Nos. 09-1045, 09-1130, 2011 WL 722601, at *3 (Bankr. S.D.N.Y.
Feb. 22, 2011).  On September 16, 2008, Lehman Brothers Holdings
Inc., LBI, LB 745 LLC (collectively "Lehman"), and Barclays
entered into an Asset Purchase Agreement, pursuant to which
Barclays agreed to purchase certain assets and undertake certain
obligations related to LBI's North American broker-dealer and
investment banking operations.  Id. at *2-3.  The APA provided
that Barclays "shall assume, effective as of the Closing, and
shall timely perform and discharge in accordance with their
respective terms," certain liabilities of LBI, including "all

liabilities assumed under Article IX." (Bam R. at A-31 ("APA"),
at §§ 2.3 & 2.3(c)).

Article IX enumerated certain obligations owed to employees
of LBI. Specifically, Barclays agreed to continue to employ or
offer employment to all active employees of LBI, with certain
exceptions not applicable here. (APA § 9.1(a).) All such
employees who accepted Barclays's offer of employment were to be
referred to as "Transferred Employees." Id. Barclays also
undertook to provide the Transferred Employees with certain
severance benefits. Specifically, the APA provided that
Barclays would provide to each Transferred Employee whose
employment was terminated by Barclays during the period from the
Closing to December 31, 2008 "by reason of a 'reduction in
force' or a 'job elimination'":

> severance payments and benefits at levels that are no less
> favorable than such levels as the Transferred Employee
> would have been entitled to receive pursuant to the
> provisions of the Seller's severance plans or agreements
> covering such Transferred Employee as in effect immediately
> prior to the Closing.

(APA § 9.1(b).)

The APA made clear that, other than those employment-
related liabilities "expressly assumed pursuant to Article IX
[of the APA]," Barclays would not assume or be liable for any
"Liabilities relating to the employment, potential employment or
termination of employment of any Person relating to or arising

5

out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement." (APA § 2.4(d).) At the time the APA was executed, both Coreth and Bam were employees of LBI.

The APA also contained a no third-party beneficiary clause which provided that: "Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below." (APA § 13.9.) The APA provided that it was to be governed by New York Law. (APA § 13.6.)

On September 20, 2008, following a lengthy hearing, the Bankruptcy Court signed the Sale Order approving the APA ("the Sale Order"). In re Lehman Bros. Holdings Inc., 2011 WL 722601, at *3. The Sale Order included a paragraph titled "No Successor Liability," which provided that:

> Except for the Assumed Liabilities, the transfer of the Purchased Assets . . . to [Barclays] under the Purchase Agreement shall not result in (i) [Barclays] having any liability or responsibility for any claim against [Lehman] or against an insider of [Lehman], or (ii) [Barclays] having any liability or responsibility to [Lehman] except as is expressly set forth in the Purchase Agreement. Without limiting the effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the Purchased Assets . . . from [Lehman] to [Barclays] does not and will not subject [Barclays] . . . to any liability for claims . . . against [Lehman] . . . by reason of such transfer . . . including, without limitation, any successor liability.

(Bam R. at A-99 ("Sale Order"), at ¶ S.)   The Sale Order also enjoined the assertion of claims against Barclays arising from Barclays's purchase of Lehman's assets.   It provided that:

> Except as expressly permitted by the Purchase Agreement or by this Sale Order, all persons and entities . . . holding Interests or Claims of any kind or nature whatsoever against or in [Lehman] or [Lehman's] interests in the Purchased Assets . . ., arising under or out of, in connection with, or in any way relating to, [Lehman], the Purchased Assets, the operation of [Lehman's] businesses before the Closing Date or the transfer of [Lehman's] interests in the Purchased Assets to [Barclays], shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing [such claims] against [Barclays] . . . .

(Sale Order at ¶ 7.)

## C.

On September 22, 2008, both Bam and Coreth received offers of employment from Barclays.   The offer of employment, which was sent in the form of a generic email to all former Lehman employees, stated that "[a]s a Barclays employee, you will continue to receive your current base salary or applicable commission based remuneration."   (Bam R. A-116; Coreth R. 1 Ex. E.)   The emails also provided that "[y]ou will be an 'at will' employee of Barclays.   This means that either you or Barclays can end our employment relationship at any time, with or without reason."   Id.   The offer was to be accepted by attending work on September 22, 2008 and by sending an email indicating an intention to accept.   Id.   The offers did not make any specific

7

mention of bonus payments, severance payments, or other terms of employment, besides those mentioned above. Id. Both Coreth and Bam accepted Barclays's offer of employment.

On October 14, 2008 and November 20, 2008, respectively, Barclays terminated Coreth's and Bam's employment pursuant to a reduction in force in accordance with the terms of the Purchase Agreement. In re Lehman Bros. Holdings Inc., 2011 WL 722601, at *4 & n.8. Barclays offered Coreth a separation package that included continuation of salary and benefits until the earlier of June 27, 2009 or new employment, and a "special lump sum payment" of $1,960,000. (Coreth R. 1, Ex. F.) Barclays also offered Bam a separation package that included a severance payment in the amount of approximately $50,000. (Bam R. A-9, at ¶ 25.) Barclays contends, and the appellants do not dispute, that these severance payment offers were calculated in accordance with Lehman's company-wide severance plan. Both Coreth and Bam rejected these severance offers, which were contingent on a waiver and general release of legal claims against Barclays. In re Lehman Bros. Holdings Inc., 2011 WL 722601, at *4. Barclays did not offer to pay the bonus guarantees set forth in Coreth's or Bam's LBI employment agreements.

## D.

In February, 2009, Coreth commenced an adversary proceeding against Barclays in the United States Bankruptcy Court for the Southern District of New York.  Coreth's adversary complaint asserted one claim for breach of contract under the APA. (Coreth R. 1, at ¶¶ 25-30.)  In March, 2009, Barclays filed a motion to dismiss Coreth's adversary complaint.  (Coreth R. 8.)

In February, 2009, Bam commenced an action in the New York State Supreme Court, New York County, asserting claims against Barclays under Section 193(1) of the New York Labor Law and for breach of contract.  In re Lehman Bros. Holdings Inc., 2011 WL 722601, at *5.  On March 20, 2009, Barclays filed a notice of removal of this action pursuant to 28 U.S.C. § 1452(a) and this case was subsequently referred to the Bankruptcy Court.  Id.  In April, 2009, Barclays moved to dismiss Bam's adversary complaint.  (Bam R. A-66.)  On May 7, 2009, Bam filed an amended adversary complaint against Barclays which asserted two causes of action for breach of contract, the first alleging a breach of Bam's LBI employment contract that was allegedly assumed by Barclays and the second alleging a breach of Barclays's September 2008 offer of employment to Bam.  (Bam R. A-10, at ¶¶ 28-37.)  Bam also asserted a third cause of action alleging that Barclays reduced Bam's wages in violation of New York Labor

Law § 193(1) by failing to pay Bam her guaranteed minimum bonus. Id. at ¶¶ 38-41.

On February 22, 2011, the Bankruptcy Court issued a Memorandum Decision granting Barclays's motions to dismiss.  In re Lehman Bros. Holdings Inc., Nos. 09-1045, 09-1130, 2011 WL 722601 (Bankr. S.D.N.Y. Feb. 22, 2011).  The Bankruptcy Court concluded that the appellants lacked standing to assert claims under the APA because they were not parties to that agreement and because the agreement contained a no third-party beneficiary clause, which the Bankruptcy Court concluded was a decisive bar to enforcement of the agreement by third parties.  Id. at *5-8. The Bankruptcy Court also concluded that, independently of the appellants' lack of standing, they had failed to state viable claims against Barclays because Barclays did not assume their employment agreements with LBI and because the severance obligations that Barclays did undertake under § 9.1(b) of the APA did not include the obligation to pay the appellants' guaranteed minimum bonuses.  Id. at *7-9.  The Bankruptcy Court also rejected Bam's separate claim that Barclays breached its September 2008 offer of employment to her by failing to pay the guaranteed minimum bonus set forth in her LBI employment agreement.  Id. at *9.  Finally, the Bankruptcy Court dismissed Bam's claim under New York Labor Law § 193(a), concluding that Bam had no contractual right to the wages she sought, which was

fatal to her New York Labor Law claim.  <u>Id.</u> at *10.  On March 8, 2011, the Bankruptcy Court issued separate orders dismissing the adversary complaints brought by Coreth and Bam.  (A-219-20.)

On March 18, 2011, and March 22, 2011, respectively, Coreth and Bam filed notices of appeal from the March 8 Orders of the Bankruptcy Court.  (Coreth R. 27; Bam R. A-221-22.)


## II.

When reviewing a decision of the Bankruptcy Court, this Court reviews the Bankruptcy Court's conclusions of law <u>de novo</u> but accepts its findings of fact unless they are clearly erroneous.  <u>See</u> Fed. R. Bankr. P. 8013; <u>In re Halstead Energy Corp.</u>, 367 F.3d 110, 114 (2d Cir. 2004).

The Bankruptcy Court dismissed the adversary complaints by Coreth and Bam pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor.  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial

---

[1] Federal Rule of Bankruptcy Procedure 7012(b) incorporates Federal Rule of Civil Procedure 12(b)(6).  <u>See</u> Fed. R. Bankr. P. 7012(b).

but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002).

### III.

The initial inquiry is whether the appellants have standing to sue Barclays for breach of contract.  The Bankruptcy Court concluded that the appellants did not have standing to assert claims under the APA because they were not parties to that agreement and because the agreement contained a no third-party beneficiary clause, which the Bankruptcy Court concluded was a decisive bar to enforcement of the agreement by third parties.

Under New York law, "[a] party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contact between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'"  Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 251 (2d Cir. 2006) (quoting Cal. Pub. Employees Ret. Sys. v. Shearman & Sterling, 741 N.E.2d 101 (N.Y. 2000)).  The APA contained a "negating clause," which provided that:  "Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below."  (APA § 13.9.)  "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established:  '[w]here a provision

exists in an agreement expressly negating an intent to permit
enforcement by third parties, . . . that provision is
decisive.'"  India.com v. Dalal, 412 F.3d 315, 321 (2d Cir.
2005) (quoting Nepco Forged Prods., Inc. v. Consol. Edison Co.
of N.Y., Inc., 470 N.Y.S.2d 680, 681 (App. Div. 1984)).

     The appellants contend that the negating clause does not
preclude their claims against Barclays.  First, the appellants
argue that persons to whom obligations are expressly owed by the
language of an agreement have standing to sue under that
agreement, notwithstanding any negating clause to the contrary.
Thus, they contend, the specific recitation of obligations in
§ 9.1(b) of the APA to pay "severance payments and benefits" to
Transferred Employees "trumped" the general disclaimer of third-
party beneficiary rights in the negating clause.  However,
courts applying New York law have consistently found that, even
where a contract expressly sets forth obligations to specific
individuals or categories of individuals, those individuals do
not have standing to enforce those obligations by suing as
third-party beneficiaries when the contract contains a negating
clause.  For example, in LaFata v. Raytheon Co., 147 F. App'x
258 (3d Cir. 2005), the Court of Appeals for the Third Circuit,
applying New York law, concluded that a former employee could
not sue as a third-party beneficiary for breach of severance
payment obligations specifically owed to such an employee in a

14

stock purchase agreement, because that agreement contained a
negating clause.  Id. at 261-62.  In that case, section 9.3(d)
of the stock purchase agreement provided that:  "The Sellers
shall be responsible for . . . severance, change of control, or
similar amounts payable to any Assumed Employees . . . ."  Id.
at 261.   The court rejected the plaintiff's argument that this
provision gave rise to third-party beneficiary rights, noting
that, based on the negating clause, "[t]he parties clearly
intended no third party beneficiaries 'except as otherwise
provided' in the [stock purchase agreement].  And it is equally
clear that the provision under which LaFata claims to be
entitled to severance pay, Section 9.3(d), does not expressly
confer third party beneficiary status on persons in LaFata's
position."  Id. at 262.  Thus, under New York law, even where a
contract specifically states that performance is owed to an
identified third party, a negating clause still operates as a
decisive bar to enforcement of the contract by that third party.[2]

---

[2] The appellants cite Diamond Castle Partners IV PRC, L.P. v.
IAC/Interactivecorp., 918 N.Y.S.2d 73 (App. Div. 2011), for the
proposition that a specific recitation of rights to third
parties "trumps" a general negating clause.  It is true that
language in Diamond Castle does support this proposition.  See
id. at 75 (concluding that giving effect to the contract's
general negating clause would "ignore the clear, specific
provisions of the purchase agreement recognizing plaintiffs'
rights under the agreement, which we decline to do") (citing Bd.
of Managers of Alfred Condo. v. Carol Mgmt., 624 N.Y.S.2d 598,
600 (App. Div. 1995)).  However, in permitting the plaintiffs to

See Dalal, 412 F.3d at 319, 321-22 (reversing district court's conclusion that fact that stock purchase agreement identified plaintiff by name and indicated that he would be paid under a separate agreement in a disclosure schedule attached to the stock purchase agreement entitled him to sue as a third-party beneficiary under the stock purchase agreement despite presence of negating clause); In re General Media, Inc., 368 B.R. 334, 338, 343-44 (Bankr. S.D.N.Y. 2007) (plaintiff could not sue as third-party beneficiary under agreement with negating clause, even though agreement identified the plaintiff by name and recited obligation of debtor to offer employment to the

---

sue despite the negating clause, the court in Diamond Castle also relied upon the fact that the plaintiffs could be construed as "parties" to whom the negating clause would not apply, given that the agreement in several instances used the term "parties" to refer to nonsignatory affiliates of the buyer and seller such as the plaintiffs.  Id. at 74-75.  In any event, to the extent that Diamond Castle can be read to support the appellants' argument that it would be contradictory for an agreement to confer rights on specific individuals but then deprive those individuals of the ability to enforce those rights, it runs contrary to the principle in New York law that "contracting parties may simultaneously elect to confer a benefit or right upon a third party and to limit that right, including by limiting the third party's enforcement powers."  BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 410 (S.D.N.Y. 2011); see also Dalal, 412 F.3d at 321 (rejecting district court's conclusion that "the specific identification of [the plaintiff] in the contract supersedes the general language in the Negating Clause, which explicitly excluded any third-party beneficiaries from recovery under the [Stock Purchase Agreement]" (internal quotation marks omitted)).

plaintiff); see also Katz v. Pershing, LLC, 672 F.3d 64, 73 (1st
Cir. 2004) ("The plaintiff has not pointed to any New York case
in which an explicit disclaimer of third-party beneficiary
claims has been overlooked for any reason, and our research has
revealed none.").

The appellants contend, however, that, even if they cannot
sue Barclays under the APA as third-party beneficiaries, they
can sue Barclays directly under a theory of successor liability.
Specifically, they contend that, when a purchase contract
provides for the buyer to assume a seller's obligation to a
third party, the third party can have a direct claim against the
buyer, despite the existence of a negating clause in the
contract.  The appellants rely on Union Carbide Corp. v. Siemens
Westinghouse Power Corp., No. 99 Civ. 12003, 2001 WL 91714
(S.D.N.Y. Feb. 2, 2001).  In that case, the plaintiff attempted
to sue Siemens for breach of certain obligations it claimed
Siemens assumed as Westinghouse's corporate successor following
an asset purchase agreement between Siemens and Westinghouse.
The court concluded that the plaintiff could not sue Siemens
under the asset purchase agreement between Siemens and
Westinghouse, because that agreement contained a negating
clause, which constituted a decisive bar to enforcement by third
parties such as the plaintiff.  Id. at *3.  However, the court
noted that the plaintiff also alleged that, under the terms of

the asset purchase agreement, Siemens "assumed and succeeded all of Westinghouse's liabilities and obligations" owed under a separate purchase order, which the plaintiff claimed Siemens breached.  Id.  The court concluded that the plaintiff could sue Siemens for breach of this separate purchase order, notwithstanding the negating clause in the asset purchase agreement.  Id.; see also Feldstein v. Nash Cmty. Health Servs. Inc., 51 F. Supp. 2d 673, 692-93 (E.D.N.C. 1999) (applying North Carolina law); In re Safety-Kleen Corp., 380 B.R. 716, 740 (Bankr. D. Del. 2008) (applying Delaware law).

These cases are of no help to the appellants.  In each of them, the plaintiffs sued on the basis of a contract that had been assumed by the defendant.  As the Bankruptcy Court correctly concluded, Barclays did not assume the appellants' LBI employment contracts.  In re Lehman Bros. Holdings Inc., 2011 WL 722601, at *6.  Indeed, the structure of the APA provided that potential liabilities relating to employment or termination of employment of LBI employees were expressly excluded from the APA, except as expressly assumed in Article IX.  (APA § 2.4(d).)  In Article IX, Barclays undertook to provide the former LBI employees with certain severance benefits.  But this provision did not purport to assume the specific employment contracts of the former LBI employees or provisions of those contracts.  It was an undertaking of what Barclays would provide to the former

LBI employees.  The appellants are left to sue on the promise
Barclays made to LBI, but the negating provision prevents them
from doing so.  To accept the appellants' argument in this case
would undercut the cases affirming the importance of a negating
provision under New York law.  Accordingly, the Bankruptcy Court
correctly concluded that the appellants lacked standing to
assert claims under the APA due to the APA's negating clause,
which constituted a decisive bar to enforcement of the agreement
by third parties.

### IV.

Bam argues, however, that Barclays did in fact assume her
entire employment agreement with LBI, including the obligation
to pay her guaranteed minimum bonus, by agreeing to employ
Transferred Employees from Lehman in § 9.1(a) of the APA, and by
employing Bam until November, 2008 under the terms of employment
that applied to her at LBI.  However, the language of the APA
does not support this contention.  While the APA sets forth
Barclays's obligation to "continue to employ" or "offer
employment to" all active LBI employees, it says nothing about
the terms of such employment or whether specific provisions of
the Transferred Employees' LBI employment contracts would remain
in effect upon the commencement of their employment with
Barclays.  Nor can it be said that the APA's broad language

19

regarding continuation of employment effectuated an assumption
of Bam's entire employment agreement with LBI.  As the
Bankruptcy Court emphasized, Section 365 of the Bankruptcy Code
does not permit the assumption of entire executory contracts by
inference or by way of generalized and inapposite language in an
asset purchase agreement.  See Lehman Bros. Holdings Inc., 2011
WL 722601, at *8-9; 11 U.S.C. § 365(a) (requiring court approval
for the assumption of an executory contract); In re FBI Distrib.
Corp., 330 F.3d 36, 45 (1st Cir. 2003) (concluding that
employment agreement could not be assumed by implication); In re
Burger Boys, Inc., 94 F.3d 755, 763 (2d Cir. 1996).  There is no
language in the APA assuming bonus obligations or entire
executory contracts.[3]  Thus, Bam's argument that her entire
employment agreement with Lehman was assumed by virtue of

---

[3] Under § 9.1(c) of the APA, Barclays also agreed to "pay each
Transferred Employee an annual bonus . . . in respect of the
2008 Fiscal Year that, in the aggregate, are equal in amount to
100 percent of the bonus pool amounts accrued in respect of
amounts payable for incentive compensation (but not base salary)
and reflected on the financial schedule delivered to [Barclays]
on September 16, 2008 . . . ."  (APA § 9.1(c).)  However, Bam
does not contend that she is entitled to her guaranteed minimum
bonus pursuant to this provision.  (Nov. 22, 2011 Oral Arg. Tr.
("Tr.") at 42.)  Moreover, this is also a promise by Barclays to
Lehman rather than the assumption of a Lehman contract.

§ 9.1(a) of the APA is not persuasive[4] and the Bankruptcy Court did not err in dismissing Bam's first breach of contract claim on this basis.

## v.

Bam also argues, in an argument that forms the basis for her second breach of contract claim, that Barclays's September 22, 2008 offer of employment to her incorporated by reference the bonus obligation set forth in her LBI employment agreement and that Barclays therefore breached this new contract when it failed to pay this bonus.  Specifically, Bam contends that, because Barclays's employment offer omitted material terms concerning her employment that were set out in her LBI contract, such as her salary and position title, the two documents should be construed as one agreement.  Under New York law, "[w]hether multiple writings should be construed as one agreement depends upon the intent of the parties."  TVT Records v. Island Def Jam

---

[4] Indeed, counsel for Bam appeared to retreat from this contention at oral argument, relying instead on the argument that Barclays's September 2008 offer of employment to Bam incorporated by reference the obligation to pay her guaranteed minimum bonus.  See Tr. 46 ("THE COURT:  Where in the asset purchase agreement do you think that there is a reasonable argument that Barclays assumed Bam's employment agreement with Lehman Brothers?  MR. LICUL:  I don't think it's in – I think our argument is that [it] was part of the post-purchase agreement, separate agreement between Ms. Bam and Barclays.").

Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) (quoting Commander

Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 52-53 (2d

Cir. 1993)).  While the intent of the parties "is typically a

question of fact for the jury," where "the documents in question

reflect no ambiguity as to whether they should be read as a

single contract, the question is a matter of law for the court."

Id.

Here, there is no ambiguity as to whether the LBI

employment contract and the Barclays offer were intended to be

read as a single contract; it is plain that the two documents

were intended to be read separately.  Bam cites TVT Records for

the proposition that "all writings which form part of a single

transaction and are designed to effectuate the same purpose

[must] be read together, even though they were executed on

different dates and were not all between the same parties."  412

F.3d at 89 (quoting This Is Me, Inc. v. Taylor, 157 F.3d 139,

143 (2d Cir. 1998)).  However, the two documents at issue here

did not form part of a single transaction and were not designed

to accomplish a singular purpose.  To the contrary, Bam's LBI

employment agreement was directed towards one transaction –

namely, the terms and conditions of Bam's employment with LBI

when she began working there in March, 2008 – while her Barclays

employment offer addressed a separate transaction – namely,

Bam's employment with Barclays in September, 2008 after Lehman's

bankruptcy and Barclays's purchase of LBI's business.  Cf. This Is Me, Inc., 157 F.3d at 145 (documents could be construed as part of the same transaction where they had singular purpose of securing actress Cicely Tyson's appearance in a Broadway play). Moreover, while the fact that the two documents at issue here were not executed at the same time or by the same parties is not dispositive, see TVT Records, 412 F.3d at 89-90, this fact does weigh against a conclusion that the documents were intended to be read together as a single contract, see Big East Ent., Inc. v. Zomba Enters., Inc., 453 F. Supp. 2d 788, 799 (S.D.N.Y. 2006) (concluding that agreements were not part of same transaction and were not intended to be read together where there were separate parties, different dates of execution, and separate purposes to the agreements), aff'd, 259 F. App'x 413 (2d Cir. 2008) (summary order).  Further, the fact that the documents do not refer to each other, while also not dispositive, also weighs against the conclusion that the documents were intended to be read together.  Cf. Trade Wind Distrib., LLC v. Unilux Ag, No. 10 Civ. 5716, 2011 WL 4382986, at *3 (E.D.N.Y. Sept. 20, 2011) (finding that documents were intended to be read together where one document made repeated references to the other).  The Barclays employment offer makes no reference to Bam's LBI employment contract and certainly does not refer to the bonus obligation contained therein or suggest that this obligation was

to be incorporated into the new employment offer.  Indeed, the
September 22, 2008 e-mail indicated only that Bam would "receive
your current base salary or applicable commission based
remuneration," and made no reference to any bonus.  (Bam R. A-
116.)  Thus, Bam's argument that her Barclays employment offer
was intended to be read together with her original LBI
employment contract and the bonus obligation contained therein
is unavailing.[5]  Accordingly, the Bankruptcy Court did not err in
dismissing Bam's second breach of contract claim.

---

[5] For similar reasons, Coreth's argument that his September 2008
offer of employment from Barclays incorporated by reference the
severance obligations that Barclays undertook in the APA is
unpersuasive.  Coreth contends that, even if he does not have
standing to sue under the APA, he has a direct claim against
Barclays for breach of its September 2008 offer because that
offer stated that it was being made "as a result of the Court's
entry of the Sale Order" (Coreth R. 1 Ex. E), and the Sale Order
included Barclays's undertaking to provide severance payments
and benefits.  Coreth argues that these severance obligations
were therefore incorporated by reference in his September 2008
offer of employment and breached by Barclays when Barclays
failed to pay the guaranteed minimum bonus set forth in Coreth's
LBI employment contract.  However, it is clear that the Sale
Order and the Barclays employment offer were not intended to be
read together as a single document.  They concern distinct
transactions and were not designed to accomplish a single
purpose.  Namely, the Sale Order was designed to accomplish the
sale of LBI's business to Barclays following the Lehman
bankruptcy, while the Barclays offer was directed towards
Coreth's employment with Barclays.  Moreover, the Sale Order
addresses the obligations that Barclays owed to Lehman, whereas
Barclays's offer of employment addresses the obligations
Barclays owed to Coreth.  Accordingly, Coreth's attempt to

**VI.**

Bam's third cause of action alleges that, by failing to pay her guaranteed minimum bonus, Barclays reduced her wages in violation of New York Labor Law § 193(1).  However, as explained above, Barclays had no contractual obligation to pay Bam's guaranteed minimum bonus under her LBI employment contract.  A "plaintiff cannot assert a statutory claim for wages under the Labor Law if [s]he has no enforceable contractual right to those wages."  Tierny v. Capricorn Invs., L.P., 592 N.Y.S.2d 700, 703 (App. Div. 1993).  Thus, Barclays's failure to pay Bam's LBI bonus does not constitute a violation of New York Labor Law § 193(1), and the Bankruptcy Court did not err in dismissing Bam's third cause of action.

---

assert a direct claim against Barclays on the basis of his September 2008 offer of employment is unavailing.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the Orders of the Bankruptcy Court are **affirmed**. The Clerk is directed to close these cases and to close any open motions.

**SO ORDERED.**

**Dated:**     New York, New York
         July 26, 2012

                                            John G. Koeltl
                                    United States District Judge